IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

GARY MORRISON, individually
and on behalf of all similarly situated insureds,

                Plaintiff,

v.                                  CIVIL ACTION NO.   3:23-0451

INDIAN HARBOR INSURANCE COMPANY and
PENINSULA INSURANCE BUREAU, INC.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiff Gary Morrison's Motion for Partial Summary Judgment on Coverage Issue (ECF No. 146) and Defendants Indian Harbor Insurance Company and Peninsula Insurance Bureau, Inc.'s Motion for Summary Judgment. ECF No. 144. On September 8, 2025, the Court held a hearing on the motion. Upon consideration of the parties' arguments and for the following reasons, the Court **GRANTS** Plaintiff's motion and **DENIES** Defendants' motion.

**I.
FACTUAL AND
PROCEDURAL BACKGROUND**

On May 6, 2022, a house owned by Plaintiff experienced flood damage. At the time, Plaintiff had a flood insurance policy issued by Indian Harbor Insurance Company ("Indian Harbor"). Soon after the flood, Bruce Massof, an independent field inspector and adjuster with FKS Insurance Services LLC, was sent to inspect the property. In his report dated May 23, 2022, Mr. Massof estimated the "Replacement Cost Value" of Plaintiff's loss at $35,737.17 and the

"Actual Cost Value" at $31,422.90. *Bruce Massof Rep.* (May 23, 2022), ECF No. 144-6, at 144. The difference between the "Replacement Cost Value" and the "Actual Cost Value" of $4,314.27 represented the depreciation Mr. Massof applied to certain damaged items, including drywall, electrical wires, receptacle outlet circuit assemblies, the main service panel, a wall light fixture, the water heater, the furnace unit, a condensing unit, the basement stairs, a vapor barrier, and ductwork, and replacing and painting a window. *Id*. at 141-43. There was no depreciation taken for such things as general cleaning and pressure washing, removing the damaged items, cleaning and treating the plumbing lines, and debris removal. *Id*. Mr. Massof sent a revised report on June 16, 2022, which included damage to a detached garage. *Bruce Massof Rep.*, ECF No. 144-6, at 144. With this addition, Mr. Massof recalculated the "Replacement Cost Value" at $37,469.18 and the "Actual Cost Value" at $32,921.06, which accounted for $4,548.12 in depreciation. *Bruce Massof Rep.* (June 16, 2022), ECF No. 144-6, at 103.[1]

On June 23, 2022, Sherri Wynter, an account manager with third-party administrator Peninsula Insurance Bureau, Inc. (Peninsula), emailed Plaintiff a letter with a "Sworn Statement in Proof of Loss" for Plaintiff's review and signature. In her email, Ms. Wynter wrote that Plaintiff should "[f]eel free to contact . . . [her] with any questions." *Email from Sherri Wynter to Pl.* (June 23, 2022), ECF No. 144-6, at 94. In the attached letter, Ms. Wynter used Mr. Massof's revised calculations, applied Plaintiff's $5,000 deductible, and stated that a check for the net amount of $27,921.06 would be sent to Plaintiff after he returned the notarized Proof of Loss form. *Ltr. from Sherri Wynter to Pl.* (June 23, 2022), ECF No. 144-6, at 95. The letter also said:

---

[1]Similar to his previous calculation, Mr. Massof only calculated depreciation for replacing and painting one panel of the garage door. There was no depreciation for cleaning. *Id*., ECF No. 144-6, at 101.

> You are entitled to present a claim for the applied depreciation ($4,548.12) following completion of repairs. We request that you submit the invoices, canceled checks, or other evidence of payment to illustrate your actual incurred cost. Based upon the estimated damages your maximum recover is $37,469.18. However, we require that you document incurred cost of at least $37,469.18 for the described repairs to collect the full amount of depreciation.
>
> In the event that you have any questions or comments regarding our handling of this matter please contact the undersigned.

*Id*. at 96. The "Sworn Statement in Proof of Loss" detailed the figures quoted by Ms. Wynter and further provided that a "Supplement Claim for Recoverable Depreciation" must be filed with 180 days of the loss. *Sworn Statement in Proof of Loss*, ECF No. 144-6, at 97. The next day Plaintiff emailed Ms. Wynter a signed and notarized copy of the "Sworn Statement in Proof in Loss." *Email from Pl. to Wynter* (June 24, 2025), ECF No. 144-6, at 105. Indian Harbor then paid Plaintiff $27,921.06 on the claim.

On June 23, 2023, one year after Plaintiff received Ms. Wynter's letter, he filed this lawsuit as a putative class action alleging that he should have been paid "Replacement Cost Value," not "Actual Cash Value," and Defendants wrongfully deducted $4,548.12 in depreciation. *Compl.*, ECF No. 1. After motions to dismiss were filed, Plaintiff filed an Amended Complaint and voluntarily dismissed Sherri Wynter as a defendant. *Am. Compl.*, ECF No. 37; *Order of Vol. Dismiss.*, ECF No. 39. Thereafter, a second round of motions to dismiss were filed by Indian Harbor and Peninsula and another named Defendant Neptune Flood Incorporated.[2]

---

[2]When the Court granted Plaintiff's Motion for Leave to File Amended Complaint, the Court also denied the original motions to dismiss without prejudice. *Mem. Op. and Order* (Jan. 9, 2024), ECF No. 36.

On July 1, 2024, this Court entered a Memorandum Opinion and Order addressing the issues raised in the motions. In its decision, the Court reviewed the insurance policy and determined that "the policy permits Indian Harbor to pay an insured actual cash value until repairs, replacement, and reinstatements are effected. Additionally, the policy provides that an insured who is paid actual cash value has 180 days after the date of loss to present a claim to recover the depreciated amount." *Morrison v. Indian Harbor Ins. Co.*, Civ. Act. No. 3:23-0451, 2024 WL 3258213, at *4 (S.D. W. Va. July 1, 2024). However, as Plaintiff raised factual issues, the Court stated that it was

> unable to determine what Plaintiff told Defendants about his damages, whether he submitted any evidence of the cost of repair, or what misleading information he believes he was given. While Plaintiff's executed and notarized Sworn Statement in Proof may be strong evidence he agreed to accept actual cash value, the Court does not know what transpired before he signed this document. These are all factual issues best reserved for discovery.

*Id*. at *5. Therefore, the Court denied Indian Harbor and Peninsula's motion to dismiss Plaintiff's claims for declaratory judgment/breach of contract, bad faith, and unfair trade practices. *Id.*[3] Additionally, the Court denied Neptune Flood Incorporated's motion to dismiss, but it found that, in the interests of justice, Plaintiff should have the opportunity to file a Second Amended Complaint to allege additional facts to support his claims under the Unfair Trade Practices Act that sound in fraud. *Id.* at *8.

Following this Court's decision, Plaintiff filed a Second Amended Complaint on July 15, 2024. On January 21, 2025, this Court entered a Joint Stipulation of Dismissal and Order

---

[3] With respect to Plaintiff's claim for unfair trade practices, the Court also found he sufficiently alleged that Defendants' purported violations were a general business practice. *Id*. at *6.

-4-

between Plaintiff and Neptune, dismissing Neptune from this action. *Jnt. Stip. of Dismissal and Order*, ECF No. 98. Thus, the only claims remaining are against Indian Harbor and Peninsula, which include: Count I—Declaratory Judgment/Breach of Contract against Indian Harbor; Count II—Allegations under Rule 23 of the West Virginia Rules of Civil Procedure against Indian Harbor; Count III—Common Law Bad Faith against Indian Harbor; and Count VI—Unfair Trade Practices against both Indian Harbor and Peninsula. The parties conducted discovery on these claims and, subsequently, filed the pending cross motions for summary judgment.

## II.
## LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

As this matter is before the Court based upon diversity of jurisdiction, the Court also must apply West Virginia substantive law to determine the merit of the parties' motions. *See Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301, 306 (4th Cir. 2020) (applying state law to a contract dispute in federal court based upon diversity). Under West Virginia law, insurance polices are "controlled by the rules of construction that are applicable to contracts generally." *Westfield Ins. Co. v. Sistersville Tank Works, Inc.*, 895 S.E.2d 142, 149 (W. Va. 2023). In this regard, if the language in the policy is clear and unambiguous, it is "'not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended.'" *Id*. (quoting Syl., *Keffer v. Prudential Ins. Co. of Am.*, 172 S.E.2d 714 (W. Va. 1970)). To this end, a court should ascertain to the fullest extent possible "'the meaning of the policy as manifested by its language.'" *Id*. (quoting *Payne v. Weston*, 466 S.E.2d 161, 166 (W. Va. 1995)). However, such language may be found to be ambiguous if it is "'reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning[.]'" Syl. Pt. 3, *id*. (quoting Syl. Pt. 1, *Prete v. Merchants Prop. Ins. Co. of Indiana*, 223 S.E.2d 441 (W. Va. 1976)). In that case, West Virginia law requires it "'be strictly construed against the insurance company and in favor of the insured.'" *Id*. at 149 (quoting Syl. Pt. 4, *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 356 S.E.2d 488 (W. Va. 1987)). "Stated simply, 'any ambiguity in the language of an insurance policy is to be construed liberally in favor of the insured, as the policy was prepared exclusively by the insurer.'" *Id*. at 150 (quoting *Horace Mann Ins. Co. v. Leeber*, 376 S.E.2d 581, 584 (W. Va. 1988) (other citations omitted)). With these principles in mind, the Court turns to the issues raised in this case.

## III.
## DISCUSSION

In his current motion, Plaintiff asserts the property at issue was a residential rental property and not his principal residence. Defendants do not contest this fact, but it is information that was unknown to the Court when it ruled on the parties' Motions to Dismiss. In ruling on the earlier motion, the Court believed the flooded property was Plaintiff's principal residence as the Amended Complaint referred to the house as "Plaintiff's home" on several occasions[4] and neither party advised the Court that the house was a rental property. Importantly, the fact the house is not Plaintiff's principal residence requires the Court to reexamine how the Policy applies to this case because it treats rental properties and an insured's principal residence differently. Moreover, the Court's earlier decision was made in the context of Motions to Dismiss. As additional undisputed evidence was revealed during discovery and now is being raised at the summary judgment stage, the Court will not place excessive reliance upon its earlier decision as it simply rested on whether Plaintiff had stated a plausible claim.

In considering this new information, the Court observes the main Policy sets forth "three different methods of settling losses: 'Replacement Cost', Special Loss Settlement, and 'Actual Cash Value'. Each method is used for a different type of property[.]" *Flood Ins. Pol'y*, at 22, ECF No. 144-10, at 39. The second method of settlement, the "Special Loss Settlement," is not relevant here as it applies to manufactured and mobile homes and travel trailers. *Id.* at 23. The first method of settlement, the "Replacement Cost Loss Settlement" applies to a single-dwelling

---

[4] *Am. Compl.* ¶¶11, 18, 48.

principal residence. *Id.*[5] Under certain conditions, this provision allows for an insured to make a claim for "Actual Cash Value," which is the depreciated amount,[6] and it then gives the insured 180 days to make a claim for additional liability. *Id*. Believing the flooded property was Plaintiff's principal residence, the Court quoted and relied upon this section in ruling on Defendants' Motions to Dismiss the Amended Complaint. *Morrison*, 2024 WL 3258213, at *3. However, it is now uncontested that the property was not Plaintiff's principal residence, but rather a rental property. Thus, the Court finds this provision does not apply as the Court originally believed.

The last method of settlement is for "Actual Cash Value Loss Settlement," which covers "[a] 'Dwelling' that is not your principal residence." *Flood Ins. Policy*, at 23-24.[7] As the insured property in this case was a rental property, this provision ordinarily would apply, and there is nothing in this section of the Policy that allows an insured to recover for depreciation. In this case, however, Plaintiff was issued a "Replacement Cost Endorsement" (the "Endorsement"), which altered the coverage issued to Plaintiff for his rental property.

> The Endorsement provides:
>
> In consideration of the premium paid for this Insurance, reference to "Actual Cash Value" in the Policy to which this Endorsement applies are [sic] deleted and "Replacement Cost" substituted thereof, subject to the following provisions:

---

[5] A "principal residence . . . means that, at the time of loss, you or your spouse lived there for at least 80 percent of: (1) The 365 days immediately preceding the loss; or (2) The period of your ownership, if you owned the 'Dwelling' for less than 365 days . . . ." *Id*. at 22.

[6] The Policy defines "Actual Cash Value" as "the cost to replace an insured item of property at the time of loss, less the value of its physical depreciation." *Id*. at 2.

[7] The term "Dwelling" is defined in the Policy as a "'Building' designed for use as a residence for no more than four families." *Id*. at 2.

    **a)** Any settlement shall be based on whichever is the least of the cost of repairing, replacing or reinstating the destroyed or damaged property with material of like kind and quality;

    **b)** The repair, replacement or reinstatement (all hereinafter referred to as "replacement") shall be intended for the same occupancy as the destroyed or damaged property;

    **c)** The replacement must be executed with due diligence and dispatch;

    **d)** Until replacement has been effected the amount of liability under this Policy in respect of loss shall be limited to the actual cash value at the time of loss;

    **e)** If replacement with materials of like kind or quality is restricted or prohibited by any laws, ordinance or law, any increased cost of replacement due thereto shall not be covered by this Endorsement.

The Underwriters' liability for loss under this Policy, including this Endorsement, shall not exceed the smallest of the following amounts:

    **i.** the amount of the Policy applicable to the destroyed or damaged property, or

    **ii.** the replacement cost of the property or any part thereof identical with such property and intended for the same occupancy and use, or

    **iii.** the amount actually and necessarily expended in replacing said property or any part thereof, [sic]

If the property is rebuilt at a new location, the cost described above shall not exceed the cost that would have been incurred if the property had been rebuilt at its former location.

*Replacement Cost Endors.*, ECF No. 144-10, at 48. In his deposition, Plaintiff said that he repaired the electrical panel himself, cleaned the hot water tank to working order, paid for the HVAC system and ductwork to be replaced, and had the property "pretty much taken care of" by May 25, 2022,

when he showed the property to new renters.[8] Ex. A, *Dep. of Pl.*, at 58:21-24; 59:1-2; 60:15-21; 63:17-24 (Dec. 11, 2024), ECF No. 146-1. After the renters moved into the house, Plaintiff states he did a few touchups outside the house, but everything inside the house was finished. *Id*. 61:2-11; 62:5-24. At some point thereafter, Plaintiff said that he went back and replaced the hot water tank, but he could not remember when it occurred. *Id*. 64:4-9. In any event, the original hot water tank was in working order as of May 25.

Based upon this evidence, Plaintiff argues that the cleanup and replacements were "effected" under paragraph d of the Endorsement at the time he received Ms. Wynter's communication and the "Sworn Statement in Proof of Loss." Therefore, Plaintiff claims he was entitled to receive $37,469.18, minus his $5,000 deductible, and his claim should have never been reduced to "Actual Cash Value." Likewise, Plaintiff insists he should not have been required to produce receipts for the completed work within 180 days as that requirement neither is found in the Endorsement nor the "Actual Cash Value Loss Settlement" provision. Plaintiff asserts that Defendants failed to investigate and recognize that the work was complete by the time of Ms. Wynter's communication, and Defendants misled him into believing he only could receive "Actual Cash Value" after he produced receipts for the completed work. However, as Plaintiff did most of the work himself, he said he had no way to produce receipts for using his own equipment and for exerting his own efforts.[9] Therefore, he resigned himself to accept the "Actual Cash Value" and

---

[8]According to Plaintiff, the renters signed a lease the following day. *Id.* 58:24; 59:1-4.

[9]Plaintiff also stated that he had a few people who worked for him help him with some of the cleanup. *Id*. 59:16-22.

signed the "Sworn Statement in Proof of Loss." After discussing the matter further with counsel, he decided to bring this action.

On the other hand, Defendants insist the claim was properly paid because the Endorsement provides that liability "shall not exceed the smallest of" (i) the applicable Policy limits, (ii) the replacement cost, or (iii) "the amount actually and necessarily expended in replacing said property or any part thereof." *Replacement Cost Endors.,* i-iii. As the only receipt Plaintiff produced was a $5,000 invoice from a heating and cooling company, Defendants argue it was entitled to pay him "Actual Cash Value" until he produced additional receipts. Additionally, Defendants argue that "[t]he Policy only insures rental properties on an actual cash value basis. Therefore, if Plaintiff's property was a rental property, then under the terms of the Policy, Plaintiff was never actually entitled to make a claim for depreciation anyway." *Defs.' Reply*, at 3.

Upon review, the Court first finds the evidence in the record clearly demonstrates that the property at issue was used as rental property. *See Bruce Massof Rep.*, at 1, ECF No. 144-6, at 134 (stating the property is rental property); *Dep. of Pl.*, at 58-60 (discussing renting the house). Second, the Court rejects Defendants' argument that Plaintiff was never entitled to make a claim for depreciation because of the "Actual Cash Value Loss Settlement" provision in the Policy. It is undisputed that Plaintiff was issued an Endorsement for replacement cost that was in effect at the time of the flood. The Endorsement clearly modifies the actual cash value limitation in the Policy, and it must be given effect. *See generally JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 605 n.7 (Tex. 2015) ("Generally, an endorsement or rider that provides specific coverage trumps an exclusion contained within the policy's primary forms."). To hold

otherwise would make the Endorsement meaningless. Moreover, Defendants consistently have insisted that Plaintiff could recover depreciation if he produced receipts for the amount he spent, and the Court finds a post-hoc argument that recovery for depreciation was never an option is baseless. As the Endorsement provides for additional coverage that is not included in "Actual Cash Value Loss Settlement" provision of the Policy, the Court now must determine how that specific coverage applies to Plaintiff's loss.

With respect to coverage under the Endorsement, Defendants make a cursory argument that replacement cost only applies to "contents." In support, they point to the declaration page that charges Plaintiff $14.00 for coverage "E. Replacement Cost of Contents." *Decl. Page from Neptune to Pl.*, ECF No. 144-10, at 5. Although Defendants accurately quote the declaration page, the Court finds the declaration page is insufficient to modify the Endorsement issued to Plaintiff.

First, while the declaration page refers to coverage "E," there is no coverage labeled "E" in either the Policy or the Endorsements provided to the Court. The Policy itself includes coverages A through D, and attached to the Policy, as a separately, page-numbered document, is an Optional Extended Coverage Endorsement describing coverages F through I. *Flood Ins. Pol'y*, at 4-11;[10] *Opt. Ext. Cov. Endors. Mod. the Stand. Flood Pol'y Cont.*, at 1-4, ECF No. 144-10, at 44-47.[11] These documents are followed by the unnumbered, single-page "Replacement Cost

---

[10]Coverage A is for a "Dwelling," coverage B is for "Personal Property," coverage C is for "Other Coverages," and coverage D is for "Increased Cost of Compliance." *Id.*

[11]Coverage F is for "Basement Contents," coverage G is for "Pool Repair and Refill," coverage H is for "Unattached Structures," and coverage I is for "Temporary Living Expense

Endorsement" at issue here. The "Replacement Cost Endorsement" page has no letter designation. Coverage E, to which the declaration page refers, is conspicuously not included in any of the documents before the Court.

Second, the Endorsement itself does not contain any language restricting coverage only to "contents." In fact, quite the opposite is true. The word "contents" is not mentioned at all in the Endorsement. Instead, the Endorsement consistently uses the much broader term "property" to describe what the Endorsement covers. As used in the Endorsement, the term "property" unquestionably includes more than just "contents." For instance, the Endorsement expressly discusses the amount of coverage available if a "property is rebuilt at a new location[.]" *Replacement Cost Endors.*, ECF No. 144-6, at 237. Limiting the Endorsement to "contents" would make this plain language nonsensical as it clearly is referring to rebuilding a structure. Therefore, given there is no limitation to "contents" in the Endorsement and there is no coverage "E" to which the "Replacement Cost on Contents" on the declaration page ostensibly applies, the Court finds that the declaration page is insufficient to modify and restrict the application of the Endorsement issued to Plaintiff to only "contents."[12]

Defendants further argue that the language of the Endorsement itself limits liability to the amount Plaintiff can show he "actually and necessarily expended" under

---

Deductible." *Id*.

[12]To the extent it is even arguable that the declaration page creates an ambiguity (which the Court does not find), that ambiguity would be construed against the insurer and in favor of Plaintiff. *See Westfield*, 895 S.E.2d at 149-150.

subparagraph iii. As Plaintiff has not produced any evidence he spent more than the $27,921.06 he was paid,[13] Defendants assert the claim was properly paid. However, the Court disagrees with Defendants' analysis.

As quoted above, the second section of the Endorsement provides that liability "shall not exceed the smallest of" subparagraphs i through iii. *Id.* Defendants focus on subparagraph iii, which state the "amount actually and necessarily expended in replacing said property or any part thereof." *Id*. Defendants insist that, because Plaintiff only produced a single receipt for $5,000 for the HVAC system, he has no evidence he "expended" more than he already was paid. Additionally, Defendants contend that Plaintiff did not "replace" many of the items subject to depreciation and that the Policy required him to keep an accurate record of his expenses. Therefore, Defendants argue he is not entitled to receive replacement value for those items. The Court disagrees.

Paragraph b in the first section of the Endorsement provides that "replacement" refers to "[t]he repair, replacement or reinstatement" of the destroyed or damaged property. *Id.* In other words, the Policy allowed the damaged property to be repaired and reinstated by Plaintiff, and he was not required to replace it with something new so he could obtain a receipt. In this case, it is unrefuted that Plaintiff used his own equipment and expended his own time and skills in repairing and reinstating much of the damaged property himself, for which he found it impossible to produce receipts. Thus, what was "actually and necessarily expended" by him is unknown.

---

[13]This amount reflects the actual cash value minus the $5,000 deductible.

Without that information, Defendants cannot rely upon subparagraph iii as the measure to justify depreciating the value of the damaged property.

The Court further finds that subparagraph i does not apply in this case because it is for payment of the full Policy limits, which is not at issue here. On the other hand, the Court finds subparagraph ii does apply. Under this provision, liability is determined by "the replacement cost of the property . . . . " *Id*. Defendants determined the "Replacement Cost Value" of Plaintiff's loss at $37,469.18, and there does not appear to be any dispute that it is a fair assessment. Plaintiff relies upon this figure to prove what he should have been paid, minus his $5,000 deductible, and argues receipts are unnecessary in this situation because Defendants already calculated and agreed to how much it would take to repair and restore the property, which was done. The Court agrees with Plaintiff and finds that $37,469.18 is the smallest ascertainable figure under paragraphs i, ii, and iii that can be used.

Additionally, Defendants argue that it should not have to pay Plaintiff that amount because paragraph d in the first section allows the payment of actual cash value "[u]ntil replacement has been effected[.]" *Id.* Defendants insist Plaintiff merely cleaned some of the flood-damaged property and cleaning is not evidence that replacement was effected. However, as previously mentioned, the Endorsement's reference to "replacement" includes repair and reinstatement. The unrefuted evidence is that, in addition to replacing the HVAC system, Plaintiff repaired or reinstated everything in the house to working order *before* Ms. Wynter's communication with him reducing his payment to actual cash value. Given this unrefuted evidence, the Court finds the replacement was "effected" when Plaintiff was paid actual cash value.

Additionally, Defendants apparently were satisfied with its the "Replacement Cost Value" as it acted upon it with proof of loss and a check. As Defendants acted upon its "Replacement Cost Value," but wrongly depreciated, Plaintiff need not do anything.

Defendants further emphasize that Plaintiff agreed to accept actual cash value, with a right to make a claim for depreciation within 180 days, when he signed the "Sworn Statement in Proof of Loss" sent to him by Ms. Wynter. As Plaintiff never made a claim to recover the depreciation, Defendants assert he is foreclosed from doing so now. While it is true that Plaintiff completed the "Sworn Statement in Proof of Loss," Plaintiff's argument is that Defendants misled him into signing the statement because depreciation should have never been taken in the first place. Instead, Defendants should have paid him replacement cost at the outset. Moreover, there is no language in either the Endorsement or the "Actual Cash Value Loss Settlement" provision in the Policy that requires Plaintiff to make a claim within 180 days. Instead, the 180-day requirement is found in the "Replacement Cost Loss Settlement," which only applies to primary residences.[14] The Court agrees that the 180-day requirement does not apply to Plaintiff under the terms of the Policy or the Endorsement.

Therefore, having fully considered the arguments of the parties, the Court finds there is no genuine issue of material fact as to the coverage issue and Plaintiff is entitled to full

---

[14] Although Plaintiff asks the Court to discount the "Sworn Statement in Proof of Loss" because it states it is to Certain Underwriters at Lloyd's, London, the Court declines to do so. Plaintiff's Policy and claim information is included on the Statement, and he does not assert that he was somehow confused by the fact it references Certain Underwriters at Lloyd's, London.

replacement cost under the clear and unambiguous language in the Endorsement and Policy issued to him by Defendant Indian Harbor.

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **GRANTS** Plaintiff Gary Morrison's Motion for Partial Summary Judgment on Coverage Issue (ECF No. 146) and **DENIES** Defendants Indian Harbor Insurance Company and Peninsula Insurance Bureau, Inc.'s Motion for Summary Judgment. ECF No. 144. In light of the Court's decision, the Court further **DIRECTS** the parties to meet and confer and submit to the Court **on or before September 29, 2025**, a new proposed Scheduling Order with regard to the remaining issues in this case.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:   September 22, 2025

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE